UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RUSSELL R. KEYS,                    :
                                    :CIVIL ACTION NO. 3:14-CV-1913
          Plaintiff,                :
                                    :(JUDGE CONABOY)
          v.                        :
                                    :
CAROLYN W. COLVIN, Acting           :
Commissioner of the Social          :
Security Administration,            :
                                    :
          Defendant.                :
_____

**MEMORANDUM**

Here we consider Plaintiff's appeal from the Commissioner's
denial of Disability Insurance Benefits ("DIB") and Supplemental
Security Income ("SSI") under Titles II and XVI of the Social
Security Act ("Act"). (Doc. 1.) Plaintiff claims disability
beginning on September 7, 2010, based on post-traumatic stress
disorder ("PTSD"), degenerative disc disease, arthritis, and
sciatic disease. (*See*, *e.g.*, R. 12, 181.) The Administrative Law
Judge ("ALJ") who evaluated the claim concluded that Plaintiff's
severe impairments of degenerative disc disease of the lumbar
spine, degenerative disc disease of the cervical spine, right
shoulder rotator cuff tear, right carpal tunnel syndrome,
depressive disorder, adjustment disorder, and post-traumatic stress
disorder did not meet or equal the listings. (R. 14-16. He also
found that Plaintiff had the residual function capacity ("RFC") to
perform sedentary work with certain limitations. (R. 16-21.) The

ALJ therefore denied Plaintiff's claim for benefits.  (R. 27.)
With this action, Plaintiff argues that the decision of the Social
Security Administration is error for the following reasons: 1) the
ALJ found Plaintiff's ankle impairment to be non-severe (Doc. 11 at
11-12); 2) substantial evidence does not support the ALJ's
determination that there are jobs that exist in significant numbers
in the national economy that Plaintiff can perform (*id.* at 13-18);
3) the ALJ failed to accord adequate weight to Plaintiff's treating
physician, Dr. Kimberlee Young (*id.* at 18-20); 4) the ALJ did not
properly assess Plaintiff's credibility about the severity of his
symptoms (*id.* at 20-24); 5) the ALJ did not make specific findings
about Plaintiff's ability to perform basic work related activities
(*id.* at 24-27); and 6) substantial evidence does not support the
ALJ's assessment of Plaintiff's GAF scores (*id.* at 27-28).  For the
reasons discussed below, we conclude Plaintiff's appeal of the
Acting Commissioner's decision is properly granted in part.

## I. Background

### A. Procedural Background

Plaintiff protectively filed a Title II application for DIB on
August 18, 2010.  (R. 12.)  He protectively filed a Title XVI
application for SSI on February 28, 2011.  (*Id.*)  These claims were
denied initially on May 26, 2011.  (*Id.*)  Plaintiff filed a written
request for a hearing on July 12, 2011, and the hearing was held
before ALJ Patrick S. Cutter on November 28, 2012.  (*Id.*)

Plaintiff was represented by counsel at the ALJ hearing and a Vocational Expert also testified.  (*Id.*)  In his March 13, 2013, decision, the ALJ concluded that Plaintiff was not under a disability within the meaning of the Social Security Act from September 7, 2010, through the date of the decision.  (R. 13.) This determination was made at step five where the ALJ concluded Plaintiff had the residual functional capacity to perform jobs that exist in sufficient numbers in the national economy.  (R. 21.)

On April 11, 2013, Plaintiff requested review of the ALJ's hearing decision.  (R. 7-8.)  The Appeals Council denied his request for review on August 11, 2014.  (R. 1-6.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On October 2, 2014, Plaintiff filed the above-captioned matter in this Court.  (Doc. 1.)  Plaintiff filed his supporting brief (Doc. 11) on January 23, 2015, and Defendant filed her responsive brief (Doc. 13) on February 25, 2013.  With the filing of Plaintiff's reply brief (Doc. 14) on March 4, 2015, this case became ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on November 6, 1968, and was forty-one years old on the alleged disability onset date of September 7, 2010.  (R. 12, 21.)  He did not engage in substantial gainful activity since the onset date.  (R. 14.)  Plaintiff has a high

school education.  (R. 36.)  He served in the United States Army
from August 1987 to March 1991.  (R. 792.)  Plaintiff has work
experience as a warehouse worker and equipment assistant.  (R. 21.)

**1.   Summary of Physical Impairments**

**a.   Ankle Impairment**

In a Lebanon Veterans Affairs Medical Center ("VAMC")
Medication Management note dated June 8, 2009, Plaintiff stated
that sometimes his ankles were painful.  (R. 865.)

March 9, 2010, exam notes from Lebanon VAMC indicate
Plaintiff reported that he sprained his left ankle during a
basketball game while in the United States Army in 1991.  (R. 587.)
He was diagnosed with right ankle sprain in May of that year.
(*Id.*)

In a December 15, 2010, Chronic Pain Pre-evaluation at the
Lebanon VAMC, it was noted that Plaintiff had a twenty percent
service connected disablity rating due to limited motion of ankle--
ten percent times two.  (R. 512.)  (At the time of the evaluation,
the "location of pain" was recorded as "bilat low back/radicular."
(*Id.*))

A March 16, 2010, Compensation and Pension Examination Note
indicates that Plaintiff was "requesting service connection for . .
. bilateral ankle sprain."  (R. 786.)  Historically, Plaintiff
began experiencing bilateral ankle pain and weakness during basic
training.  (R. 787.)  Plaintiff received conservative care

4

initially and his service medical records show that he again received conservative care when he twice experienced ankle sprains bilaterally while playing basketball.  (*Id.*)  At the March 16, 2010, examination, he stated that the pain was typically more intense on the right; he described the pain as sharp, shooting, and throbbing, and rated it as a 5 on a scale of 0-10.  (*Id.*)  He related that the course of pain had been ongoing and chronic for both ankles, that he experienced weakness, instability, a feeling of giving way and lack of endurance.  (*Id.*)  He experienced occasional swelling and redness to the lateral aspect of the ankles which was aggravated with prolonged activity.  (*Id.*)  Treatment consisted of soaking in Epsom Salts, ice and heat therapy when needed (as recommended by his primary care physician) and occasional use of ankle supports.  (*Id.*)  At the time of the examination, he neither received regular follow-up care for his ankle problems nor was he prescribed medication for his ankles, however he was taking Meloxicam and Percocet for back and neck pain, reporting little relief and no side effects from these medications.  (*Id.*)  Plaintiff reported that flare-ups could be precipitated by inclement weather or excessive walking or standing.  (*Id.*)  He also reported that symptoms could last for a few hours and were alleviated with rest and elevation.  (*Id.*)  He stated that he did not use corrective shoes, inserts or a cane and high top athletic shoes felt supportive.  (R. 787-88.)  Plaintiff also

stated that carrying heavy boxes when he worked loading boxcars aggravated his ankles but he worked for a short time as a file clerk in 1992 and had minimal difficulty due to his ankles.  (R. 788.)  He reported switching from one foot to another when operating automobile pedals due to pain, and he no longer mountain bikes or hikes, and he is unable to tolerate uneven terrain.  (*Id.*) He stated that he performs activities of daily living independently, though they take longer during episodes of pain. (*Id.*)  Plaintiff reported losing approximately 460 hours of work due to his back and knee conditions.  (*Id.*)  He also reported standing is limited to ten to fifteen minutes due to knee and ankle pain.  (*Id.*)

Upon physical examination, Plaintiff presented in no acute distress and was able to move around independently.  (R. 789.) Pain and discomfort were elicited with certain manipulations. (*Id.*)  Plaintiff rated pain upon examination bilaterally as 8 on a scale of 0-10.  (*Id.*)  Plaintiff had one episode of losing balance when asked to tandem walk.  (R. 790.)  Imaging studies of the ankles were within normal limits.  (*Id.*)  The following diagnosis was recorded: "1. Subjective complaints of chronic ankle pain with history of ankle sprains; 2. Mild pes planus bilaterally; 3. Onychomycosis bilaterally; 4. Pinch callus hallux bilaterally." (*Id.*)

On March 11, 2011, Plaintiff had a podiatry consultation

appointment because of thick toenails which he was unable to cut because of back pain.  (R. 521.)  Orthopedic examination showed full range of motion of the ankle joints.  (R. 522.)  Regarding his gait, Plaintiff was noted to be ambulating with a cane in mild pain.  (*Id.*)

In the Ankle Conditions Disability Benefits Questionnaire dated June 18, 2012, Plaintiff reported a similar history but noted that he periodically wears elastic ankle supports and admitted to using a cane periodically after an ankle flare-up.  (R. 990-91.)  Upon examination, it was determined that Plaintiff had functional impairment of the ankles with less movement than normal, pain on movement, tenderness and pain on palpitation in both ankles.  (R. 993-94.)  The examiner opined that Plaintiff's ankle condition did not impact his ability to work.  (R. 1000.)

Notes from Plaintiff's October 3, 2011, Lebanon VAMC Podiatry Clinic visit indicate he was seen because of a toenail problem. (R. 923.)  Full range of motion of his ankle joints was recorded. (R. 924.)  Regarding his gait, Plaintiff was noted to be ambulating with a cane in mild pain.  (*Id.*)

**b.   Degenerative Disc Disease and Sciatic Disease**

The record shows that Plaintiff has treated regularly for these conditions and undergone numerous diagnostic studies.

On March 17, 2009, Plaintiff was seen at the Pinnacle Health Emergency Department for back pain.  (R. 444.)  He reported a

history of recurrent back pain getting progressively worse and an inability to stand up straight to get out of bed that morning. (*Id.*)  Plaintiff stated he was "pretty healthy" aside from the chronic back pain.  (*Id.*)  At the time Plaintiff had a sitting job at work so the plan was for him to be discharged to home, take off work that day and the next, avoid heavy lifting for ten to fourteen days, take Naproxen and Percocet as prescribed, get an MRI of the spine, and follow up with his family physician.  (*Id.*)

A March 18, 2009, MRI of the lumbar spine, concluded that Plaintiff had mild degenerative disc disease of the lumbar spine. (R. 257.)

In an outpatient note dated November 4, 2009, Plaintiff presented with complaints of acute exacerbation of the right-sided SI joint (sacroiliac joint) pain.  (R. 274.)  In the subjective portion of the note, it was recorded that Plaintiff had a degenerative disc disease and chronic back issues with episodic flare-ups which had been happening more frequently.  (*Id.*) Physical examination was limited due to Plaintiff's obvious acute distress, including difficulty moving or bending.  (*Id.*)  Plaintiff was assessed to have degenerative disc disease and SI joint exacerbation with the right-sided sciatica.  (*Id.*)

In a December 28, 2009, Consult for his low back pain, Plaintiff reported that the pain began in 1988 and had been progressive in nature since then.  (R. 316.)  He further reported

that it exacerbated significantly over the past year, especially due to increased job demands. (*Id.*)

Plaintiff's back pain was treated with medication (*see*, *e.g.*, R. 274), injections (*see*, *e.g.*, R. 300), physical therapy, and use of a TENS unit (*see*, *e.g.*, R. 317). As of December 28, 2009, Plaintiff reported that Percocet helped his pain, physical therapy improved his pain, the TENS unit provided only minimal help, and steroid injection was very helpful. (R. 317.)

At a March 9, 2010, examination at the Lebanon VAMC Plaintiff stated that he had treated with private physicians for his back and neck pain since 1993 or 1994. (R. 588.) He reported that he was taking Tramadol, Baclofen, and Vicodin prescribed by his family doctor for the lower back and neck pain. (*Id.*) (He stated that he did not take any specific medications for his knee, wrist and ankle problems but the medications for his back and neck may help. (*Id.*)) Plaintiff did not have difficulty getting on and off the examining table or taking off/putting on his shoes and socks. (R. 589.) He was able to squat only 50% due to back pain. (*Id.*) Plaintiff was working as a fork lift operator and stated he had limitations at work, adding that he missed 248 hours due to his wrist, back, or knee pain. (R. 588-89.)

In April 2010, Plaintiff was assessed to have bilateral SI joint arthropathy and spinal spondylosis. (R. 462-63.) It was noted that Plaintiff had a favorable response to the right SI joint

9

injection for four weeks and left SI joint injection for one week, and also there was a questionable L5-S1 junction as an additional generator of Plaintiff's pain.  (R. 463.)  Plaintiff had a medical branch block and experienced resolution of the left SI joint pain afterwards.  (R. 467.)  Plaintiff experienced some recurrence of the right-sided SI joint pain after several months of resolution after the previous injection.  (*Id.*)  It was also noted that Plaintiff had possible lumbar spine bilateral radiculopathy with mild radicular symptoms overlying his SI joint problems.  (*Id.*) The plan was for Plaintiff to have another right-sided SI joint steroid injection.  (*Id.*)

A January 31, 2011, MRI of the lumbar spine showed the following; mild degenerative disc disease at L2-L3 and L3-L4; and mild bilateral neuroforaminal stenosis at L3-L4.  (R. 480.)

On March 1, 2011, Plaintiff was seen for a consult, beginning his two-step Chronic Pain Clinic evaluation, the reason for which was recorded to be "medication recommendation and injection therapy consideration for low back pain with radiculopathy."  (R. 603.) The visit focused on the psychological factors that could interfere with pain management and overall physical care by his primary care physician.  (R. 602.)  It was noted at the time that Plaintiff used a cane to ambulate.  (R. 603.)  He complained of "exacerbation of low back pain with bilateral radiation down legs extending to his feet affects his balance to the point of falling."  (*Id.*)

10

On May 31, 2011, Plaintiff was referred to the Chronic Pain Evaluation Clinic at the Lebanon VAMC for recommendation regarding management of his chronic back pain with specific consideration for injection therapy.  (R. 886.)  The record includes the following:

> Mr. Keys notes that he had two falls while he was in the military in 1987.  He fell from a bunker about 10' and he fell from a tower about 20'; both times landing on his back. Since that time, he has had problems with low back pain.  He notes continuous pain in his low back area with radiation into his buttocks, which has stayed the same over time.

(R. 886.)  It was also noted that Plaintiff had been followed by Hershey Medical Center where he had a series of SI joint injections from which he had benefitted and he was again experiencing the same kind of pain.  (Id.)  He rated his pain on average at seven out of ten during the preceding twenty-four hours.  (*Id.*)  Recommendations included referral for sacroiliac joint injection on the left and considering referral to vocational rehabilitation to explore employment opportunities for patients with back pain.  (R. 889.)

On January 29, 2013, Plaintiff was seen at Lebanon VAMC.  (R. 1110.)  By history, his medical provider, Kimberlee Young, M.D., noted that Plaintiff was being seen between visits "with low back pain since his rucksack days, chronic neck pain and more problematic recently as the right shoulder rotator cuff issues and left knee pain with some buckling, worse recently.  That has been off and on since 1987." (*Id.*)  Dr. Young recorded the following

11

Assessment and Plan:

1.   Chronic low back pain.  We will continue
     to address.  Once drug screens are clear
     we may be able to start Percocet.

2.   Chronic neck pain.  Same as above.

3.   Right shoulder pain with the rotator
     cuff issue and decreased range of motion
     and the left knee pain with buckling.
     We will get him to Orthopedics for these
     last two issues with x-rays prior.  He
     will be seeing me back in a month and a
     half with fasting labs and a urine drug
     screen one week prior.  If the drug
     screen is clear we will consider
     restarting his Percocet.  He may want to
     do monthly drug screens at that point.
     We will also put in his orthopedic
     referral and x-rays so that if the drug
     screens stay clear he can be
     reconsidered for surgery.

(R. 1110-11.)

## c.   **Rotator Cuff**

On February 4, 2011, Lebanon VAMC notes indicate Plaintiff was

seen for left shoulder pains which he reported that he had

experienced off and on for several months.  (R. 511.)  On

examination, Plaintiff had some rotator cuff weakness and pain when

abducting the arm against resistance.  (*Id.*)  Plaintiff was treated

with a steroid injection and recommendation for physical therapy.

(*Id.*)

Progress notes from Plaintiff's May 31, 2012, visit to the

Lebanon VAMC indicate Plaintiff had persistent right shoulder pain,

that he had twice been scheduled for surgery but the procedures

12

were cancelled when he tested positive for cannabis (which he stated he takes orally), and he would be given one more opportunity to undergo right shoulder surgery.  (R. 1001.)  Plaintiff indicated he wanted to proceed with surgical intervention.  (*Id.*)  Plaintiff was again worked up for surgical treatment of his shoulder in March 2013.  By July 2013, Plaintiff had decided against shoulder arthroscopy.  (R. 1207.)

d.  **Carpal Tunnel Syndrome**

On December 31, 2009, Plaintiff visited the Milton S. Hershey Medical Center with complaints of wrist pain, stating he had problems beginning on December 22nd or 23rd.  (R. 264.)  He had not had a recent injury but reported that he had bilateral wrist fractures when he was in the army.  (*Id.*)

In May 2011, Plaintiff complained of right wrist and thumb pain and was diagnosed with carpal tunnel syndrome and right trigger thumb.  (R. 894.)  He underwent right trigger thumb release and right carpal tunnel release on April 20, 2012.  (R. 967.)  At his follow-up visit in June 2012, Plaintiff reported some slight stiffness in the morning but overall was assessed to be doing "quite well."  (R. 955.)  It was suggested that at some point he may want to do his left side, but Plaintiff wanted to fully recover from surgery before considering it.  (*Id.*)

2.  **Summary of Mental Impairments**

The reasons for disability claimed in Plaintiff's applications

13

include post-traumatic stress disorder ("PTSD").  (*See*, *e.g.*, R. 12, 181.)  At the ALJ hearing, Plaintiff's attorney stated that Plaintiff had been treated for depressive disorder, adjustment disorder, and PTSD.  (R. 32.)

On July 31, 2009, a Psychiatry Note from Lebanon VAMC indicates Plaintiff went to the emergency room wanting to speak with someone about controlling his behavior and improving his mood. (R. 657.)  Plaintiff said that he had become extremely angry and had a "meltdown" after a critical email from his boss at the Army Depot in New Cumberland.  (*Id.*)  He also stated that he had become depressed and angry following repeated conflicts with his boss. (*Id.*)  Medication and follow-up were recommended.  (*Id.*)

In August 2009, a Social Worker Case Management Note indicates the social worker called Plaintiff and spoke with him after he failed to return phone calls from social workers.  (R. 653.) Plaintiff reported that he was feeling better and had not felt as though he would lose control of his behavior.  (*Id.*)  It was noted that Plaintiff would likely benefit from continued behavioral health and PTSD clinical team services.  (*Id.*)

Plaintiff continued to have problems with his boss and associated mood and anger issues.  (*See*, *e.g.*, R. 820.)  As of November 4, 2010, Plaintiff had resigned his position at the Army Depot "secondary to difficulties at work, both in terms of mood and pain."  (R. 616.)  At the time, Plaintiff had a diagnosis of

14

"adjustment disorder, mixed, with both depressive and anxiety symptoms." (*Id.*)  The reporter added that "[t]his appears to be chronic in nature.  However, his adjustment problems seem to ebb and flow; when stressful events emerge mood symptoms emerge.  Also, mood symptoms are exacerbated with pain symptoms." (*Id.*)

Plaintiff's Global Assessment of Functioning ("GAF") scores ranged from 35-61.  (R. 899, 915, 917, 933, 1108-09, 1114-16, 1118-26, 1129, 1131-33, 1144, 1152-53, 1169-70, 1194, 1202, 1209.)

Thomas G. Bowers, Ph.D., conducted a Mental Status Evaluation of Plaintiff on February 14, 2013.  (R. 1060-65.)  Dr. Bowers observed that Plaintiff's chief complaint "was apparently medical, although there were also notes of anxiety and back difficulties." (R. 1060.)  Plaintiff reported that his chief problem was sciatica pain.  (*Id.*)  Dr. Bowers noted it was difficult to interview Plaintiff because he was "poorly focused and loosely organized in his approach to materials." (R. 1062.)  Plaintiff stated that he sleeps poorly because of pain and sometimes stays up or goes without eating for as much as two days.  (*Id.*)  Dr. Bowers found the following: Plaintiff's thought processes were suspicious and mistrustful; his cognitive capabilities appeared to be sound; his abstract thinking adequate; he was oriented to time, place, and person; his impulse control was adequate but changeable; his social judgment was fair "but colored by his resentment of authority and institutions"; his reliability appeared to be good; and his insight

15

was adequate for the purpose of the evaluation.  (R. 1063.)  Dr.
Bowers explained that formal assessment of Plaintiff's memory and
learning abilities was not undertaken because his approach to the
evaluation was so disjointed, though Dr. Bowers commented that it
was likely Plaintiff's short-term memory abilities were at least
mildly limited due to distractibility, anxiety, and similar
concerns.  (*Id.*)  Dr. Bowers concluded that Plaintiff demonstrated
PTSD and Pain Disorder.  (R. 1064.)  He had a GAF of 50-60.  (*Id.*)
Dr. Bowers found that Plaintiff's overall prognosis "did not appear
to be very favorable.  (*Id.*)  Dr. Bowers further opined that with
psychiatric support, psychotherapy follow-up, physical and
rehabilitation therapy, and pain management services, his outlook
would be cautiously favorable.  (R. 1065.)

## 3.   **ALJ Decision**

By decision of March 13, 2013, ALJ Cutter determined that
Plaintiff was not disabled as defined in the Social Security Act.
(R. 23.)  He made the following findings of fact and conclusions of
law:

> 1.   The claimant meets the insured status
>      requirements of the Social Security Act
>      through December 31, 2015.
>
> 2.   The claimant has not engaged in
>      substantial gainful activity since
>      September 7, 2010, the alleged onset
>      date (20 CFR 404.1571 et seq. and
>      416.971 et seq.).
>
> 3.   The claimant has the following severe
>      impairments: Degenerative Disc Disease

16

of the Lumbar Spine, Degenerative Disc Disease of the Cervical Spine, Right Shoulder Rotator Cuff Tear, Right Carpal Tunnel Syndrome, Depressive Disorder, Adjustment Disorder, Post-traumatic Stress Disorder (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the following limitations: requires a cane to ambulate; occasional climbing, balancing, stooping, kneeling, crouching and crawling; occasional overhead work; avoid constant use of both hands; work must be such that it can be performed sitting or standing; must avoid temperatures extremes; limited to unskilled work (defined as work that requires little or no judgement to do simple duties that can be learned on the job in 30 days or less with little vocational preparation); the claimant has a moderate limitation (defined as more than slight limitation but the function can still be performed on a consistent enough basis to be satisfactory to an employer) in the ability to maintain attention and concentration and interact appropriately with coworkers and supervisors.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on November 6, 1968 and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 7, 2010 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 14-22.)  In determining that certain medical problems were non-severe impairments, the ALJ noted that there is no evidence that GI and related issues cause more than minimal limitations.  (R. 15.) The ALJ found some evidence of ankle and foot pain "but limited diagnostic data showing abnormalities or functional limitations." (*Id.*)  The ALJ adds that he has considered these impairments in combination in assessing the RFC.  (*Id.*)

The ALJ reviewed the extensive medical evidence in making his RFC determination and explained the weight given to the opinions contained in the record, noting that there is no opinion from a treating or examining source suggesting that Plaintiff is unable to work due to his impairments.  (R. 17-22.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R. 26.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is

20

limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not

21

sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).   In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.   However, the ALJ need not undertake an exhaustive discussion of all the evidence.   *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).   "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."   *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).   "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."   *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the

court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented."  *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision.  *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here,

23

we note the Third Circuit has repeatedly emphasized the special
nature of proceedings for disability benefits.  *See Dobrowolsky*,
606 F.2d at 406.  Social Security proceedings are not strictly
adversarial, but rather the Social Security Administration provides
an applicant with assistance to prove his claim.  *Id.*  "These
proceedings are extremely important to the claimants, who are in
real need in most instances and who claim not charity but that
which is rightfully due as provided for in Chapter 7, Subchapter
II, of the Social Security Act."  *Hess v. Secretary of Health,
Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974).  As such,
the agency must take extra care in developing an administrative
record and in explicitly weighing all evidence.  *Dobrowolsky*, 606
F.2d at 406.  Further, the court in *Dobrowolsky* noted "the cases
demonstrate that, consistent with the legislative purpose, courts
have mandated that leniency be shown in establishing the claimant's
disability, and that the Secretary's responsibility to rebut it be
strictly construed."  *Id.*

**B.  *Plaintiff's Alleged Errors***

As set out above, Plaintiff asserts the decision of the Social
Security Administration is error for the following reasons: 1) the
ALJ found Plaintiff's ankle impairment to be non-severe (Doc. 11 at
11-12); 2) substantial evidence does not support the ALJ's
determination that there are jobs that exist in significant numbers
in the national economy that Plaintiff can perform (*id.* at 13-18);

24

3) the ALJ failed to accord adequate weight to Plaintiff's treating physician, Dr. Young (*id.* at 18-20); 4) the ALJ did not properly assess Plaintiff's credibility about the severity of his symptoms (*id.* at 20-24); 5) the ALJ did not make specific findings about Plaintiff's ability to perform basic work related activities (*id.* at 24-27); and 6) substantial evidence does not support the ALJ's assessment of Plaintiff's GAF scores (*id.* at 27-28).

## 1.   **Ankle Impairment**

Plaintiff asserts that the ALJ erred in finding Plaintiff's ankle impairment non-severe.  (Doc. 11 at 11.)  Defendant responds that the ALJ's finding was proper and, even if the Court were to find the ankle impairment severe, the ALJ's decision does not lack substantial evidence because he did not deny the claim at step two. (Doc. 13 at 11-13.)  We conclude that any claimed error on this issue would be harmless.

When an ALJ finds an impairment non-severe at step two, the error is harmless where the ALJ finds in the claimant's favor at this step in the analysis. *Salles v. Commissioner of Social Security*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) (not precedential) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)).  Because the outcome of a case depends on the demonstration of functional limitations, where an ALJ identifies at least one severe impairment and ultimately properly characterizes a claimant's symptoms and functional limitations, the failure to

identify a condition as severe is deemed harmless error. *Garcia v. Commissioner of Social Security*, 587 F. App'x 367, 370 (9th Cir. 2014) (citing *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007)); *Burnside v. Colvin*, Civ. A. No. 3:13-CV-2554, 2015 WL 268791, at *13 (M.D. Pa. Jan. 21, 2015); *Lambert v. Astrue*, Civ. A. No. 08-657, 2009 WL 425603, at *13 (W.D. Pa. Feb. 19, 2009).

Although the ALJ found Plaintiff's ankle impairment non-severe at step two of the sequential evaluation process, other impairments were found to be severe and Plaintiff's claim proceeded through the five-step analysis with Plaintiff's severe and non-severe impairments and/or their functional limitations considered in combination to determine Plaintiff's RFC. (*See*, *e.g.*, R. 15, 16-17.) Plaintiff's difficulty ambulating and postural limitations were considered in the RFC determination. (R. 16-20.) Plaintiff does not suggest otherwise, nor does he assert that his ankle impairment, if deemed severe, would independently meet or equal a listing at step three of the analysis, a finding which would entitle him to benefits without further inquiry. Therefore, this claimed error is not cause for remand.

## 2.   <u>Step Five Evaluation</u>

Plaintiff avers that substantial evidence does not support the ALJ's step five determination because the ALJ did not properly resolve conflicts between the VE's testimony and the Dictionary of Occupational Titles ("DOT"). (Doc. 11 at 13.) Defendant responds

that there is no apparent conflict between the VE's testimony and the DOT.  (Doc. 13 at 13.)  Plaintiff raises three areas of conflict: sit/stand option; unskilled work; and bilateral manual dexterity.  (Doc. 11 at 13-18.)

**a.   Sit/Stand Option**

*i.   Information Provided to Vocational Expert*

Plaintiff first argues that the ALJ did not give the VE sufficient information for the VE to make the finding that Plaintiff could perform the jobs of security monitor, addresser, and sorter even with the sit/stand option because SSR 96-9p requires specificity as to the frequency and duration of a claimant's sit/stand option.  (Doc. 11 at 13-14.)  Defendant maintains the ALJ did not run afoul of SSR 96-9p with the hypothetical posed to the VE.  (Doc. 13 at 14.)  We conclude that the alleged error regarding the specific language used by the ALJ would be harmless.

Social Security Ruling 96-9p addresses "[a]lternate sitting and standing" as follows:

> An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically.  Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded.  The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of the time needed to stand.  The RFC assessment

27

> must be specific as to the frequency of the
> individual's need to alternate sitting and
> standing.  It may be especially useful in
> these situations to consult a vocational
> resource in order to determine whether the
> individual is able to make an adjustment to
> other work.

SSR 96-9p, 1996 WL 374185, at *7 (S.S.A.)  In interpreting this
provision, courts have found that the requirement that a claimant
be permitted to sit or stand at will may not be totally compliant
with the strictest interpretation of SSR 96-9p, but have generally
found the inclusion of such a limitation to be harmless error.
*See*, *e.g.*, *Barnhart v. Colvin*, Civ. A. No. 1:14-CV-00767, 2015 WL
778334, at *10 (M.D. Pa. Feb. 24, 2015) (listing cases).

Here the ALJ stated that the hypothetical individual could do
work that "can be performed either sitting or standing."  (R. 56,
58.)  We find the reasonable implication of the ALJ's description
is that the hypothetical claimant could choose between sitting and
standing at will.  The VE interpreted the hypothetical to include
work which could be performed with a sit/stand option with no
limitations placed on the claimant's exercise of the option.  (R.
57, 59.)  Therefore, even if strict adherence to the language of
SSR 96-9p required the ALJ to state the frequency that the
hypothetical claimant needed to alternate between sitting and
standing, any error would be harmless because the jobs the VE
identified included an option to sit or stand at will.  *See*, *e.g.*,
*Hodge v. Barnhart*, 76 F. App'x 797, 800 (9th Cir. 2003).

28

Therefore, this claimed error is not cause for remand.

*ii.  DOT/Vocational Expert Conflict*

Plaintiff next asserts that the ALJ erred because he did not find out whether the VE's conclusions regarding the conflict between the DOT and his sit/stand option testimony were "reliable." (Doc. 11 at 14.)  Defendant responds that the ALJ properly inquired about this conflict.  (Doc. 13 at 14 & n.2.)  We agree with Defendant.

SSR 00-4p requires that when there is a conflict regarding occupational information, the ALJ must elicit a reasonable explanation for the conflict before relying on the VE's evidence. SSR 00-4p, 2000 WL 1898704, at *2 (S.S.A.).  The ALJ has the duty to resolve the conflict by determining if the explanation given by the VE is reasonable and provides a basis for relying on his testimony.  *Id.*  Included in the list of reasonable explanations which may provide a basis for relying on the VE's testimony is the situation where evidence from the VE is not listed in the DOT.  *Id.*

The VE testified that his testimony was consistent with the DOT but the DOT does not address a sit/stand option and the reduction in numbers of positions available to the hypothetical claimant associated with the sit/stand option were based on his experience.  (R. 60.)  To the extent a conflict may exist between the DOT and the VE testimony regarding the sit/stand option, the VE testimony shows that the VE provided a reasonable explanation for

the conflict.  The failure of the ALJ to specifically state that he determined the testimony of ALJ's explanation to be reasonable and provide a basis for relying on the VE's testimony is at most harmless error.  Therefore, this claimed error is not cause for remand.

*iii. Use of Cane*

Plaintiff's third argument concerning the ALJ's step five determination is that the ALJ failed to note that the use of a cane significantly impacts a claimant's sit/stand option.  (Doc. 11 at 14.)  Defendant does not specifically respond to this argument. However, we conclude Plaintiff's claimed error is not sufficiently supported in that the ALJ included the claimant's need to use a cane to ambulate in the hypothetical (R. 58), and he required that the job could be performed either sitting or standing (R. 56) which, as described previously, reasonably implies that the hypothetical claimant could choose between sitting and standing.

We further note that Plaintiff's citation to SSR 96-9p regarding the use of a "hand-held assistive device" applies to a "*medically* required hand-held assistive device."  SSR 96-9p, 1996 WL 374185, at *7 (emphasis added).  The ruling further provides that "[t]o find that a hand-held device is medically required, there must be medical documentation establishing the need for the hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed.  Plaintiff's

30

citations to the record in support of his argument (Doc. 11 at 14 (citing R. 50, 621, 998, 1062)) do not point to any medical documentation that the cane is medically required. Although Plaintiff testified at the ALJ hearing that he had used the cane since about 2009 and it had been prescribed by the VA (R. 50-51), other citations indicate only that Plaintiff was observed to use a cane on September 24, 2010 (R. 621), and February 14, 2013 (R. 1062), and was reported to use a cane as a "normal mode of locomotion" in an Ankle Conditions Disability Benefits Questionnaire completed on June 18, 2010 (R. 998). This review of Plaintiff's supporting citations shows that Plaintiff presents no competent evidence that the cane was medically required and, therefore, he has not properly supported his argument.

Other evidence of record reinforces this conclusion. At a March 16, 2010, examination at the Lebanon VA Medical Center regarding the service connection of bilateral ankle sprain, Plaintiff "denied the use of corrective shoes, inserts or a cane. High top athletic shoes feel as if they provide support for his ankles. Occasional use of ankle supports for the ankles, approximately 4 times per week." (R. 786-88.) In the Medical History portion of the June 18, 2010, Ankle Conditions Disability Benefits Questionnaire, it was noted that Plaintiff "admits to the use of a cane *periodically* after an ankle flare-up." (R. 991 (emphasis added))--an apparent conflict with the indication that

31

the cane was used as a "*normal mode* of locomotion" (R. 998 (emphasis addded)).  At an April 16, 2012, occupational therapy evaluation at Lebanon VAMC requested by Dr. Young in order to "fill out paperwork for him fully informed/accurately," it was noted regarding ambulation that Plaintiff "ambulated to and from the clinic without use of a [sic] assistive device."  (R. 1023.)

Based on this review of the evidence and Plaintiff's argument, we conclude the claimed error regarding Plaintiff's use of a cane is not cause for remand.

*iv.  Sitting, Standing, Walking and Lifting Limitations*

Plaintiff asserts the following: "the medical record demonstrates that Keys has significant limitations in his ability to sit, stand, walk and lift, which result in a significant erosion of his occupational base.  *See* SSR 96-9p.  Therefore,  the ALJ erred by failing to consider that Keys is disabled pursuant to Medical Vocational Guideline 201.00(h)."  (Doc. 11 at 15; Doc. 14 at 4.)  Other than a footnote referring to SSR 96-9p's erosion of the occupational base related to such limitations, Plaintiff provides no support for his argument.  (Doc. 11 at 15 n.1; Doc. 14 at 4 n.1.)  SSR 96-9p has very specific directives regarding sitting, standing, walking and lifting (1996 WL 374185, at *6), none of which are addressed by Plaintiff.  Therefore, further discussion of this claimed error is not required.

**b.  Unskilled Work**

Plaintiff asserts the ALJ also erred at step five because the jobs identified by the VE of security monitor, addresser, and sorter are jobs which entail a reasoning level of 2 or 3 and could not be performed by Plaintiff who is limited to simple, unskilled work.  (Doc. 11 at 15-16.)  Defendant maintains there is no apparent unresolved conflict between the description of the jobs and the ability to perform unskilled work.  (Doc. 13 at 16.)  We agree with Defendant.

As noted by Defendant "this Court and other courts have expressly held that a reasoning level of two or three does not conflict with a limitation to unskilled work."  (Doc. 13 at 16 n.2) (citing *Geiser v. Astrue*, No. 10-1973, 2011 WL 3163219, at *12 (M.D. Pa. July 26, 2011); *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009); *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007)).) Defendant also sets out the difference between "General Education Development (GED) Reasoning Level" and "specific vocational preparation" ("SVP"), asserting that the distinction shows that the VE identified unskilled work consistent with the DOT.  (Doc. 13 at 16-17.)

> [T]he Commissioner provides that "unskilled work corresponds to an SVP [specific vocational preparation] of 1-2," SSR 00-4p, 2000 WL 1898704, and that unskilled work is, by definition, simple and routine.  20 C.F.R. §§ 404.1586(a); 416.968(a); SSR 85-15(a), 1985 WL 56857, at *4. The Commissioner does not provide, however, that the educational reasoning levels may suggest a higher skill level than as directed by the DOT's SVP

33

> level.  The unskilled nature of jobs
> identified is, therefore, not linked to
> reasoning level, but to the classification of
> a job's SVP level.  *See*, *e.g., Suarez v.
> Astrue*, No. 12-3373, 2013 WL 7203845 (E.D.
> Pa. May 8, 2013) (finding that a limitation
> to "simple, unskilled" work did not limit
> claimant's reasoning development level;
> "[t]he word 'unskilled' obviously invoked
> SVP, since that scale corresponds to the
> Social Security skill levels, with a level of
> 2 representing unskilled work").  Here, the
> jobs identified involve a SVP level of two,
> which is, by definition, unskilled, simple
> and routine jobs.  Accordingly, the
> vocational expert identified unskilled work -
> entirely consistent with the DOT.

(Doc. 13 at 16-17.)

In his reply brief (Doc. 14) Plaintiff does not directly refute this argument, and we conclude that it undermines Plaintiff's claimed error regarding a conflict between the limitation to unskilled work and jobs identified with a reasoning level of 2.  Thus, we find no cause for remand based on the reasoning levels required by the positions suggested by the VE.

**c. Bilateral Manual Dexterity**

Plaintiff also asserts the ALJ erred at step five because he did not resolve the conflict between the VE and the information provided by the DOT in violation of SSR 00-4p regarding the jobs of addresser and sorter/inspector because both require constant use of the hands and Plaintiff is unable to constantly use both hands. (Doc. 11 at 16-18.)  Defendant's response includes the assertion that one of the positions identified by the VE, surveillance

systems monitor, involves no handling or fingering and Third Circuit caselaw supports the proposition that remand is not required where inconsistencies are not present as to each of the jobs that the vocational expert listed.  (Doc. 13 at 15-16 & 16 n.3 (*citing Rutherford*, 399 F.3d at 557).)  Plaintiff does not reply to this aspect of Defendant's argument.

Based on *Rutherford* and the fact that the surveillance systems monitor position does not involve handling or fingering, even if the ALJ failed to resolve the conflict as to the other positions identified by the VE, the error would be harmless and remand on this basis is not required.

**3.   Treating Physician's Opinion**

Plaintiff asserts that the ALJ failed to accord adequate weight to the opinion of Dr. Young, Plaintiff's treating physician.[2]  (Doc. 11 at 18.)  Defendant responds that substantial evidence supports the weight the ALJ gave to Dr. Young's opinion. (Doc. 13 at 9.)  We conclude the ALJ did not err in his consideration of Dr. Young's opinion.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.  *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  The "treating physician rule," is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v.*

---

[2]  This section of the supporting brief at times refers to "Ms. Lafferty" as the plaintiff.  (Doc. 11 at 18.)

*Brown*, 794 F.2d 896 (3d Cir. 1986).  The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).[3]  "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time."  *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir.

---

[3] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

2000) (citations omitted); *see also Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008).  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion."  *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

Here the ALJ set out the following analysis of Dr. Young's opinion:

> Some weight is afforded to the opinions of Kimberlee Young, M.D., a treating source, in August 2011, suggesting that the claimant can lift up to 10 pounds, sit for 30 minutes sitting [sic], stand for 10 minutes and walk for one block with limitations on postural activities (Exhibit 13F/27-29).  Dr. Young considered the claimant's ability to perform daily tasks (particularly as to his ability to perform postural activities) and her findings are generally supported by clinical data.  However, limited weight is afforded to the standing, sitting and walking restrictions, as they appear to be primarily based on the claimant's self-assessment.  Nevertheless, the undersigned finds that a sit/stand option at the sedentary level would accommodate for these restrictions.

(R. 20.)

Contrary to Plaintiff's assertion that the ALJ assigned limited weight to Dr. Young's opinion "in its entirety" (Doc. 11 at 18), the assignment of limited weight clearly applies to standing, sitting and walking restrictions.  (R. 20.)  The rationale provided

37

by the ALJ--that Dr. Young's opinions on these activities "appear to be primarily based on the claimant's self-assessment"--is supported by the record in that Dr. Young states in the introductory sentence to the assessment of sitting, standing and walking activities that "Veteran *self-reported* the following limitations." (R. 937 (emphasis added).)  She found the sitting limitation congruent with her observations made while he was in the rehab clinic but indicated no such support for the activities of walking and standing.  (*Id.*)  Furthermore, the ALJ credits these limitations to the degree that he "finds that a sit/stand option at the sedentary level would accommodate for these restrictions." (R. 20.)  Thus, there is no inherent tension between Dr. Young's opinion and the physical limitations assigned to Plaintiff in the RFC.  Plaintiff does not discuss this aspect of the ALJ's analysis of Dr. Young's opinion and has otherwise failed to show that the ALJ's consideration of Dr. Young's opinion is cause for remand.

## 4.   **Plaintiff's Credibility**

Plaintiff next argues that the ALJ did not conduct a legally correct pain analysis.  (Doc. 11 at 20-24.)  Defendant responds that substantial evidence supports the ALJ's credibility analysis. (Doc. 13 at 22.)  We conclude the ALJ's analysis of Plaintiff's credibility regarding his pain is cause for remand.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's

38

demeanor.'"  *Coleman v. Commissioner of Social Security*, 440 F.

App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v.*

*Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).  "Credibility

determinations are the province of the ALJ and should only be

disturbed on review if not supported by substantial evidence."

*Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D.

Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873

(3d Cir. 1983)).

Social Security Ruling 96-7p provides the following guidance

regarding the evaluation of a claimant's statements about his or

her symptoms:

> In general, the extent to which an
> individual's statements about symptoms can be
> relied upon as probative evidence in
> determining whether the individual is
> disabled depends on the credibility of the
> statements.  In basic terms, the credibility
> of an individual's statements about pain or
> other symptoms and their functional effects
> is the degree to which the statements can be
> believed and accepted as true.  When
> evaluating the credibility of an individual's
> statements, the adjudicator must consider the
> entire case record and give specific reasons
> for the weight given to the individual's
> statements.

SSR 96-7p.  "One strong indication of the credibility of an

individual's statements is their consistency, both internally and

with other information in the case record."  SSR 96-7p.

The Social Security Regulations provide a framework under

which a claimant's subjective complaints are to be considered.  20

C.F.R. § 404.1529.  First, symptoms such as pain, shortness of

breath, and fatigue will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings.  20 C.F.R. § 404.1529(b).  Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work.  *Id.*  In so doing, the medical evidence of record is considered along with the claimant's statements.  *Id.*

The regulations provide that factors which will be considered relevant to symptoms such as pain are the following: activities of daily living; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medications taken to alleviate symptoms; treatment received other than medication intended to relieve pain or other symptoms; other measures used for pain/symptom relief; and other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii).

The Third Circuit has explained:

> An ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence.  *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). "While there must be objective evidence of

> some condition that could reasonably produce
> pain, there need not be objective evidence of
> the pain itself." *Green* [*v. Schweiker*, 749
> F.2d 1066, 1071 (3d Cir. 1984)].  Where
> medical evidence does support a claimant's
> complaints of pain, the complaints should
> then be given "great weight" and may not be
> disregarded unless there exists contradictory
> medical evidence. *Carter* [*v. Railroad
> Retirement Bd.*, 834 F.2d 62, 65 (3d Cir.
> 1987)]; *Ferguson*, 765 F.2d at 37.

*Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993).

Here the ALJ explained why he did not find Plaintiff completely credible. (R. 17-20.)  He initially appears to follow the appropriate two-step analysis set out in the relevant regulations and ruling. (R. 18-19.)  However, the ALJ's reasons for limiting the credibiltiy of Plaintiff's reports of pain are problematic.  The ALJ found that "[l]ongitudinal evidence reveals that the claimant's back pain is chronic with intermittent flares; however, the claimant does not require surgical intervention." (R. 18.)  The ALJ also found that the record supports that Plaintiff has some pain and difficulty performing activities of daily living, and the record documents that he has pain with prolonged sitting, standing and walking in addition to temperature changes, stooping, bending and squatting. (R. 19.)  Following these findings, the ALJ adds: "Nonetheless, VA records in late 2011 show that he could lift up 10 pounds, and his back and neck conditions were not severe enough to qualify him as a surgical candidate." (R. 19 (citing Exhibit 9F/145, 13F/9).)

Importantly, the cited ALJ statements indicate that the ALJ

discounted certain record evidence and Plaintiff's credibility based in part on the fact that he had not had surgical intervention for his chronic back and neck pain.  The problem is that the exhibits cited by the ALJ do not support the ALJ's conclusion that Plaintiff did not have surgical intervention because these conditions "were not severe enough" to require such intervention. Rather, Exhibit 13F/9 shows that on October 20, 2011, Dr. Robert Gallo recorded in the "Previous treatments" section of his notes that "[h]e has not had any previous surgery" (R. 918); Exhibit 9F/145 shows that on October 18, 2010, Dr. Young recorded in the "Chief Complaint" section of her notes that "[h]e is not a surgical candidate and would like to go back to the narcotics for medical management and he would like to go through our clinic for his pain medicine."  (R. 621.)  In a September 24, 2010, "Primary Care - Continuity of Care Note" signed by Dr. Young, under "current clinic status/future" it is recorded that "he has been told no surgery would be helpful and to manage pain with medicine."  (R. 620.) Although this entry is based on self-reporting and cannot be read to infer that surgical intervention would not be helpful if his condition became worse, it is equally true that statements indicating Plaintiff had not had surgery and been told he was not a surgical candidate cannot be read to infer that his condition was not severe enough for surgery.  We find nothing in the record to confirm that the lack of surgical intervention for Plaintiff's back and neck problems diminishes the severity of the problems or

associated reports of pain.  Because this important aspect of the ALJ's reasoning for diminishing Plaintiff's subjective complaints of pain and the limiting effects of his chronic back condition are not supported by the record, we must decide whether this error is cause for remand.  Given the importance of the credibility determination in this case--evidence showing that Plaintiff's back pain was a key factor in his reported work difficulties/attendance and a triggering factor for his mental impairments--and the remedial nature of the statute, we conclude remand is warranted.

With this determination, we note that a full credibility analysis should be conducted upon remand, with all relevant factors considered.  Because Plaintiff consistently complains of chronic back pain with flare-ups which the record shows have been difficult to manage, an accurate credibility assessment may entail further evaluation of Plaintiff's condition and a medical professional's assessment of the condition and related claimed limitations.

5.  **Mental Ability to Perform Basic Work Related Activities**

Plaintiff asserts he is unable to perform the occupations suggested by the VE pursuant to SSR 85-15 because his depression and PTSD preclude him from meeting the basic demands of unskilled work.  (Doc. 11 at 24.)  We conclude Plaintiff does not adequately support this argument.

Specifically, Plaintiff asserts that "[w]hen SSRs 85-15 and 96-6p are applied to the ALJ's RFC, Keys' impairments cause substantial loss of ability to respond appropriately to

43

supervision, coworkers, and usual work situations.  A substantial loss of ability to meet these basic work-related activities on a sustained basis warrants a finding of disability."  (Doc. 11 at 26.)  Plaintiff further asserts that "the decision reveals the ALJ did not explore the relevant mental demands before concluding Plaintiff's depression and PTSD did not preclude him from meeting those requirements" (Doc. 11 at 7).  Plaintiff's conclusory assertions and citations to evidence related to his mental impairments (Doc. 11 at 25) do not meet his burden of supporting the claimed error.

This is so particularly in the circumstances presented here: Plaintiff makes no coherent argument that the hypothetical question posed by the ALJ to the VE did not portray the limitations associated with Plaintiff's mental impairments.  (R. 56-59.)   As noted by Defendant,

> the ALJ accounted for Plaintiff's alleged
> mental limitations, to the extent they were
> credible, by limiting him to unskilled work
> that accounted for a moderate limitation in
> his ability to maintain attention and
> concentration and interact appropriately with
> coworkers and supervisors (Tr. 16-17).  In
> reaching the above limitations, the ALJ
> thoroughly discussed the medical evidence of
> record, which showed that Plaintiff's mental
> status examinations were consistently within
> normal limits (Tr 19).  Specifically,
> treating and examining physicians constantly
> found Plaintiff to have intact insight and
> judgment, appropriate affect, and no evidence
> of psychosis, mania, ideations, or
> hallucinations (Tr 701-02, 713, 721, 747,
> 772, 805, 807, 811, 815-16, 827, 898-99, 915,
> 917, 933, 1106, 1108-09, 1114-16, 1118-26,
> 1129, 1131-33, 1144, 1152-53, 1169-70, 1194,

1209).

(Doc. 13 at 18.)

Based on our review of the evidence of record and Plaintiff's argument, we conclude that remand on this issue is not warranted.

**6.   Consideration of GAF Scores**

Plaintiff asserts the ALJ erred by inaccurately assessing Plaintiff's GAF scores--"limited weight" was given to the scores (ranging from 35-65) overall, but "some weight" was afforded to scores ranging from 55-65 because they were "more representative of claimant's longitudinal functioning."  (Doc. 11 at 27-28 (quoting R. 20).)  We agree that this selective assessment is problematic.

While an ALJ may choose to discount a GAF score based on evidence in the  record, failure to specifically discuss a GAF score that supports serious impairment may be cause for remand. *Scipio v. Colvin*, Civil Action No. 12-4562, 2014 WL 3676326, at *6 (E.D. Pa. July 24, 2014) (listing cases)).

Here the ALJ mentions that Plaintiff had GAF scores "ranging from 35-65."  (R. 20.)  He does not discuss the lower GAF scores specifically.  Rather the ALJ states that

> [l]imited weight is afforded to the scores, as GAF scores are subjective and only representative of the claimant's functioning on the day assessed.  However, some weight is afforded to the scores in the VA treatment records, ranging from 55-65, as they are more representative of the claimant's longitudinal functioning.  Per the DSM-IV, a GAF score of over 50 is generally consistent with the ability to work, and a GAF over 60 represents only mild symptomatology.

(R. 20-21.)  Not only should the ALJ have specifically discussed the lower scores, but his decision to attribute greater weight to higher scores should have been more solidly supported in light of his conclusion that GAF scores are generally entitled to little weight.  Therefore, this issue should also be addressed upon remand.

## V. Conclusion

For the reasons discussed above, we conclude Plaintiff's appeal is properly granted.  This matter is remanded to the Acting Commissioner for further consideration consistent with this opinion.  An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: March 19, 2015